BREAUX, C. J.
Plaintiff brought this action to have a special election held in the parish of Jackson on the 22d day of August, 1911, recalled and decreed null.
Over 30 days prior to the election, a petition was presented to the police jury, asking that body to take steps for holding a special élection to pass upon a proposed three-mill tax for a period of ten years to pay for building a courthouse and jail. On the day that the petition was presented it was received and acted upon, and the election ordered. In due time thereafter it was held.
The returns of the election show that 610 votes were cast for the tax, representing an assessed valuation of $257,604, while against the tax 461 votes were cast, representing an assessed valuation of $216,579.
The police jury declared that the election had been carried for the tax, and ordered it to be levied.
The ground of plaintiff’s attack is that the assessment of 1910, and not the assessment of 1911, should have been taken as the basis upon which to determine who were entitled to vote. The averment of plaintiff at this point is: That over 300 names were placed on the poll list and furnished to the commissioners, and that they voted, and that more than 300 names not on the assessment rolls-of 1910 voted, and that over $50,000 were added to the assessment of that year, proper-, ty situated in the vicinity of the parish seat, and that over $50,000 of the assessed valuation were taken from the assessment roll of property in the remote parts of the parish.
That the assessment roll of 1911 for the parish was in the hands of the board of equalization. It had not been completed when the election was held.
Lastly, that the election was never legally carried.
Defendant’s exception of no cause of action was filed and overruled. The defendant then filed its answer, putting at issue the different grounds upon which plaintiff attacks the election.
[1, 2] As to the plea of no cause of action, under which defendant contends that the' 60 days from the date of the promulgation of the election within which suit contesting the election may be brought, if such a plea; can be heard on an exception of no cause of *419 action in this instance, it has no merit. In our opinion the time had not elapsed, for the date of the promulgation is not counted in computing the 60 days. Defendant admits, “if the 24th of August is not included — the date of the promulgation — then the suit was filed on the sixtieth day.” We add: And in time.
[3] On appeal defendant and appellee urged that this court is without jurisdiction ratione materise. The contention is that plaintiff's attack is leveled at the assessment clause, and that the legality or constitutionality of the tax is not put at issue.
[4] With that proposition, we are unable to agree. The attack is leveled at the election and at the assessment. The ground is that the three-mill tax is or will be illegal or unconstitutional if the election is not decreed null. The questions are of law. This court has jurisdiction; the legality of the tax being at issue. We pass the consideration that there was fraud of any kind, for there was no fraud. It is not proven, and no attempt was made to prove, that charge brought by plaintiff. There is nothing serious in plaintiff’s contention that a majority in number and amount of the property taxpayers of the parish failed to vote. To carry a special election under article 232 of the Constitution, a majority in number and value voting control. The Constitution of 1898 intentionally divorced articles 232 and 270, and under the former the majority voting suffices to carry the election. Flores v. Police Jury, 116 La. 428, 40 South. 785.
[5] This brings us to the serious issue of the cause. The taxpayers voted at the election on the assessment of the year 1911, whereas the assessment of 1910 should have been used.
: The strong point in defense is that the facts show that the plaintiff was not prejudiced by the use of the 1911 assessment.
The • roll for 1911 had not been returned by the Auditor and filed. The 322 voters who were on the assessment roll of 1910, and' not on the assessment roll of 1911, represent an aggregate assessment of $105,283. The voters under the assessment of 1911 represent also a considerable amount. How it would have resulted if the assessment of 1910 had been used it is difficult to determine. The defendant’s contention is that the election would have been carried whether the assessment of 1910 or that of 1911 was used. Of this there is no absolute certainty. In considering this point, we take up the law relating to assessment, which makes it the duty of the assessor to prepare a triplicate assessment roll, but without extending any figures or valuation thereon. He only completes his roll after notification by the Auditor of the action of the State Board of Equalization. After it is completed, he duly files it.
The election was held on the 22d day of August, 1911, and the assessment was closed and filed on the 26th day of the same month. In the incomplete condition of the rolls, changes could be made. They were not true evidence of anything particular. At any rate, they were not completed rolls such as bind parties concerned. The law evidently contemplated that a completed assessment roll should be used in determining who is entitled to vote. The commissioners appointed to hold the election are furnished with the lists of taxpayers entitled to vote, together with the valuation of each taxpayer’s property, “as shown by the assessment roll last made and 1Ued prior to each election.” (Italics ours.)
See section 6 of Act No. 256 of 1910.
If the local authorities can act by anticipation and take incomplete rolls to determine who should vote, they have a right to take any rolls — those of 1910 or 1909, any rolls.
With the exception before mentioned, the assessor had done all that was required of him in making the assessment for the year. *421 1911, and. Ms assessment rolls were in the hands of the State Board of Equalization. But it is urged by the defendant that the Board of Equalization does not complete its labors in time to permit an extension of values on the rolls and the levy of taxes thereon so as to enable the assessors to file their assessments within the required time.
If the delay be on the part of the Board of Equalization, this court cannot afford a remedy. It remains that the assessor is forbidden from extending any figures or valuations on the assessment rolls until he has received the official mandate of the State Board of Equalization.
Section 5 of Act No. 182 of 1906.
The statement is made that in an informal manner the assessors have to go to the Board of Equalization about the first week of August to obtain permission to extend their rolls. The board at that time, while not through with its labors, can, as a rule, inform the assessor whether he may go ahead with the extension of the roll. It knows whether it has completed its work as to his parish. This all unofficial, and cannot be controlling. The conversation held by any assessor with the president of the board is not official, although, doubtless, the information given was correct enough.
. But the assessor stated, in answer to a question, that the Board of Equalization sent a notice on the 26th of August, four days after the election. Prior to that time everything in the way of notice was verbal and informal, and amounted to no notice at all, if we are to be governed by the statute upon the subject Although it was not a completed roll, in fact no roll at all, the list of values to be voted was furnished from it. It seems that changes were made on the assessment roll after the assessor had received verbal notice. These changes could well be made as the rolls were not completed.
We conclude upon this point that the incomplete assessment used was not the last assessment preceding the election which should have been used under the plain language of the statute.
It is perhaps unfortunate, but our rulings heretofore have required that in matter of substance the law should be followed. We feel bound by precedent upon the subject where the oversight has been such as to create some doubt as to whether the election would have been carried if it had been held under the assessment roll of 1910.
[7] The next point of defendant is that paragraph 6 of Act No. 256 of 1910, under which the election was held, adds “qualifications to voters in special elections.” In thus adding those qualifications, it is obnoxious to article 232 of the Constitution; that, as article 232 contains no restrictions, the majority of the vote of the property taxpayers is controlling.
With this view, also, we are unable to agree. ' The voters have not acquired a vested right to vote under article 232 without reference to registration or proper qualification. The lawmaking authority has the power to pass an act regulating the vote of taxpayers, and that it shall be the last assessment. We quote the following from Cooley on Constitutional Limitations (7th Ed.) p. 905.
“While it is true that the Legislature cannot add to the constitutional qualifications of electors, it must devolve upon that body to establish such regulations as" will enable all persons entitled to the privilege to exercise it freely and securely and so as to exclude all who are not entitled from improper participation therein.”
[6] Another ground urged by defendant is that the law is directory, and not mandatory, and the failure (if failure there was) to observe it is not fatal to the election.
We will state here that the number of voters disqualified by the rolls of 1908 and the property represented by them cast an uncertainty on the result It becomes a man-. *423 dat-ory 'question because in property taxpayers elections there should be some precision in levying the tax as relates to the interested public who may not have the right to vote at all, although owning property within the election district.
In City School District v. Wahkansa, 17 Iowa, 87, the court said (part of the voters not having been included) to wit:
1 “The proportion of those in and out of the city limits, can make no difference, for, though more votes had been cast for the separate district than resided outside of the town that had been left out, such nonresidents should have the right, to be heard, and by their influence as well as votes contribute to the result. By their own votes those outside of the city might have been able to change the result, while with the aid ■ o'f those within the city (who on account of the exclusion were inactive because powerless) the proposition might have been defeated.”
[8] We will state here that absent persons who have no right to vote and others who cannot avail themselves of the opportunity tb vote should rest assured that in executing any laws increasing their taxes reasonable compliance with these laws will be observed.
In another case, presenting a similar point to the one above cited, the court held the result will not be declared upon the votes illegally cast adverse to what it would have been if no illegality had intervened. This also was a case in which part of the voters had for some reason not voted. People of Illinois ex rel. Wallace v. Salomon, 46 Ill. 415; Barry v. Lauck, 5 Cold. (Tenn.) 588.
Learned counsel for defendant cite with ■confidence the case of Floris v. Police Jury, 116 La. 430, 40 South. 785. Instead of being in opposition, we think it is favorable to the ■decision here, and for that reason we adhere -.to it. In the decision just cited, we find the ¡following, to wit:
“Of course, these qualifications can be shown <only by an assessment.” '
That is quite true and militates a little against defendant’s position in regard to article 232 of the Constitution referred to above, in which we take it he argued that there could be no restriction.
We add, in the quotation above, that the Legislature may also determine that the assessment for the election shall be the completed assessment immediately preceding the election. It follows that it shall not be the assessment not yet completed, and not yet filed; the filing being an important essential under the terms of the law.
For reasons stated, it is ordered, adjudged, and decreed that the judgment appealed from is avoided, annulled, and reversed; that the election is null, and the police jury is forever enjoined from levying or collecting the three-mill tax claimed in these proceedings; and that defendant pay costs of both courts.